IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JULIA PARSONS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 06-3258-CV-S-ODS |
| ) | |
| MICHAEL J. ASTRUE,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING SUPPLEMENTAL SECURITY INCOME BENEFITS

Pending is Plaintiff's request for review of the Commissioner's final decision denying her application for Supplemental Security Income benefits under Title XVI of the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in December 1971 and has completed the twelfth grade. In this application,[2] Plaintiff alleges she became disabled effective January 24, 2001, due to a

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security and therefore should be substituted as the Defendant in this action. Fed. R. Civ. P. 25(d)(1).

[2]This is not Plaintiff's first application for benefits. Her first was filed in 1990 (when Plaintiff was only eighteen); it was denied, and a judicial appeal resulted in affirmance in March 1994. She filed a second application in June 1994, which an ALJ denied in May 1996. A third application was filed in December 1998, which was denied by an ALJ in February 2000 and the Appeals Council declined review in February 2001. This case involves the consolidation of Plaintiff's fourth and fifth applications, filed in January 2001 and January 2003, respectively. The initial decision in the fourth application was remanded by the Appeals Council, where it was later consolidated with

combination of back and knee problems, hip problems, headaches, asthma, hypertension and asthma. The sole issue raised by Plaintiff involves the ALJ's decision not to rely on certain opinions rendered by her treating physicians. The factual background will be summarized with this in mind.

### A. Dr. Michael Ball

Plaintiff's primary physician was Dr. Michael Ball, who has been Plaintiff's general doctor since November 1997. On March 15, 2001, Dr. Ball examined Plaintiff for complaints of back pain. He concluded Plaintiff exhibited a normal gait and could walk without using an assistive device, did not exhibit neurologic abnormalities, and could lift items less than twenty pounds. Plaintiff's range of motion did not appear to be significantly limited except her lumbar flexion was limited to sixty degrees instead of the normal ninety degrees. Dr. Ball indicated Plaintiff could sit or stand for short periods of time, but he did not indicate the total amount of time she could sit and stand over the course of a day. R. at 202-06. Dr. Ball did not address Plaintiff's back pain again until July 23, 2002, at which time he again noted some restriction in her lumbar spine but "no evidence of gross restriction in her motion." R. at 233. Plaintiff returned a week later complaining of pain in her lower back. Dr. Ball noted Plaintiff was five feet six inches tall and weighed 263 pounds. Upon completing tests, Dr. Ball opined Plaintiff had "no evidence of neurologic deficit and there's no evidence of radiculopathy [and] she ambulates with no evidence of dysfunction." He diagnosed her as suffering from lumbar strain, provided her with samples of medication, and instructed her to return in one week if there was no improvement. R. at 233.

The Record does not reflect that Plaintiff returned within a week. In fact, Plaintiff did not complain about her back to Dr. Ball again until November 3, 2003. On this occasion she told Dr. Ball she had "pains for [a] long time off and on onset this time Wednesday." He prescribed a week's worth of a muscle relaxant (Skelexin). R. at 420.

Plaintiff's fifth application.

2

The next day, Dr. Ball completed a Medical Source Statement ("MSS-P") indicating Plaintiff could lift or carry ten pounds frequently and twenty-five pounds occasionally, sit for five hours in an eight hour day and two hours at a time, and stand or walk for five hours in an eight hour day and one hour at a time. In the narrative portion, Dr. Ball wrote "the patient's asthma is exacerbated by dust, fumes and/or heat. The patient is obese – her BMI is 45 which is extremely obese. These are her main limiting factors." Later, he wrote that "the patient's extreme obesity causes back pain, short[ness] of breath and fatigue." R. at 424-26.

There are no more records indicating Plaintiff saw Dr. Ball for back problems; nonetheless, on March 4, 2005, Dr. Ball issued another MSS-P. This time, he indicated Plaintiff could sit for four hours a day, stand for four hours a day, and could "sit and/or stand" for a total of four hours per day. The narrative does not mention Plaintiff's back or obesity. R. at 478-49.

## B. Dr. Floyd Simpson

Plaintiff first saw Dr. Floyd Simpson on March 9, 2000, at which time he diagnosed her as suffering from major depression (recurrent), hypertension and hyperthyroidism. He prescribed Prozac and another medication and gave instructions for her to return in two weeks. R. at 217. On March 30, Plaintiff reported the Prozac was helping; she was sleeping better, felt happier and more energetic – at least, until noon of each day, at which time she becomes tired. R. at 216. On April 13, Plaintiff reported being more active and eating less. She indicated she occasionally felt nervous but was more cheerful and pleasant and expressed her plan to continue "trying to get disability." R. at 215.[3] On May 11, Plaintiff reported a continuation of the improvement and that she had lost ten pounds. She also indicated she was not experiencing side effects from the medication. R. at 214. Plaintiff reported having "a bad day" on June

---

[3]This was apparently a reference to her third application, which had been recently denied by the ALJ. See note 2, infra.

3

15, and on June 29 reported having difficulty sleeping. R. at 212-13. On July 13, Plaintiff reported "doing well" and indicated the medication prescribed to help her sleep was working, that she was losing weight, and there were no side effects. R. at 211. Plaintiff did not return to Dr. Simpson until March 8, 2001 because "she ha[d] just forgotten to make appts to return." She reported being more tearful and irritable and having more problems sleeping of late.[4] Dr. Simpson altered her medication. R. at 210. On April 5, Plaintiff stated she was "doing well." R. at 209.

The next record of Plaintiff seeing Dr. Simpson occurred on February 4, 2002, at which time Plaintiff complained of numbness in her fingers stretching to her elbow. Dr. Simpson's notes do not clearly indicate a diagnosis or treatment. R. at 236. On February 21, 2002, Plaintiff reported being under a lot of stress and reported "she just started the Prozac again." Plaintiff also indicated she was "Still struggling to get disability." Dr. Simpson opined Plaintiff "seems to be doing reasonably well" and provided a prescription for Prozac. R. at 237. Plaintiff made positive reports on her next three visits, declaring she was "doing well" and had lost significant amounts of weight. R. at 238-41. On her last visit, she again discussed her efforts to obtain Social Security benefits. R. at 241.

Plaintiff next saw Dr. Simpson on August 15, 2002. The narrative on this report is instructive:

> [Patient] states she is doing reasonably well. She states the topamax has helped her lose [weight]. She is hopeful she will soon get her social security disability. Will cont. treatment plan.

R. at 433. That same day, Dr. Simpson completed a Medical Source Statement - Mental ("MSS-M"). Dr. Simpson checked boxes indicating Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, maintain concentration for extended periods of time, adhere to a schedule, sustain an ordinary routine without supervision, work with or near others without distraction,

---

[4]The proximity of this visit to the February 2001 denial by the Appeals Council has not gone unnoticed.

4

maintain a normal work-week without interruptions, get along with co-workers or accept criticism from supervisors, behave appropriately, and respond to changes. R. at 244-46.

The next record of Plaintiff seeing Dr. Simpson is from January 29, 2003. Plaintiff indicated she was not doing well and felt "useless." Dr. Simpson represcribed the same medications and dosages he had previously prescribed and told her to return in a month. R. at 431. Plaintiff did not return until April 21. She told Dr. Simpson "she still hasn't gotten her disability" but the medication was helping and she was pleasant and cheerful and had no complaints or requests. R. at 430. On August 13, Plaintiff reported that "on some days she gets real depressed and is tearful," but Dr. Simpson continued the treatment plan without alteration and directed her to return in two months or as needed. R. at 429.

With no visits in the interim, Dr. Simpson prepared another MSS-M on November 12, 2003. This time, he determined Plaintiff was markedly limited in her ability to carry out detailed instructions and maintain concentration for extended periods of time. He also determined Plaintiff was moderately limited in her ability to understand and remember detailed instructions, adhere to a schedule or routine, work with others without distraction, get along with others or accept criticism, or deal with changes. R. at 435-37.

### C. Dr. Kenneth Dugan

Plaintiff sought treatment in Dr. Kenneth Dugan's offices for a variety of ailments between September 13, 2002, and February 1, 2005. Not all of the visits relate to conditions relevant to these proceedings, and for the visits that are relevant Plaintiff did not see Dr. Dugan; he saw a licensed clinical social worker (Jill Franklin). On February 12, 2004 (the earliest record of a visit the Court could find), Plaintiff reported being depressed for the past ten years and crying for no reason. R. at 447. On February 20,

5

Plaintiff reported stress related to an extended stay by friends' of her husband's. Ms. Franklin counseled Plaintiff, but no medication was prescribed. R. at 448. Less than one week later, Plaintiff reported all the visitors had left, but reported she was still crying without reason or warning. R. at 449. On March 4, Plaintiff reported having a "bad week" marked by frequent crying, sleeplessness, and feelings of homicidal. Plaintiff expressed an interest in trying something different than Prozac but wanted to consider the matter further. R. at 450. A report dated the same day from Dr. Dugan's other office indicates Plaintiff saw a different person, who prescribed Zoloft. R. at 446. On March 18, the Zoloft was increased. R. at 451. The following week, Plaintiff reported the increased dosage was helping with the crying spells but was making her feel anxious. R. at 452. On April 1, Plaintiff reported having "a pretty good week" and Ms. Franklin indicated they would continue to work on "self-esteem issues." R. at 453.

Plaintiff returned to Dr. Dugan's office on June 23, September 3, and November 9, but did not see Ms. Franklin on any of these occasions. The purpose of these visits was to obtain refills of Zoloft. R. at 466-67, 472. Plaintiff did not return to see Ms. Franklin until January 13, 2005, at which time she sought help dealing with her father-in-law's impending death. Plaintiff's low self-esteem was also discussed and a general plan to "work through these issues" was announced. R. at 454. There are no further visits to Dr. Dugan's offices that are relevant to this proceeding.

On January 18, 2005, Dr. Dugan completed a MSS-M. He opined Plaintiff was markedly limited in her ability to perform activities within a schedule, maintain attendance, or complete a normal workday without interruptions. He also indicated Plaintiff was moderately limited in her ability to remember, understand or carry out detailed instructions, maintain concentration, work with others without distraction, and interact with the public. Dr. Dugan specified the condition causing these limitations was "major depression, recurrent." R. at 481-82.

6

### D. Consulting Physicians

Plaintiff was examined by several consulting physicians, four of which are addressed in her Brief. Dr. David Lutz examined Plaintiff on October 29, 2002. He opined that Plaintiff suffered from dysthymic disorder. He also indicated Plaintiff "may have some periods of major depression, but [she] did not describe sufficient symptoms here." He assessed her current GAF at 55. R. at 252-52. Dr. Lutz also completed a MSS-M and indicated Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions and maintain concentration for an extended period of time. R. at 255-57. Dr. Lutz conducted another examination on April 3, 2003, and his assessment was almost identical to his first one. R. at 381.

On April 18, 2003, Dr. Alan Aram completed a Mental Residual Functional Capacity form. He indicate Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, interact with the public, accept instructions and criticism, and work with others without distraction. R. at 384-85. Dr. Aram also completed a Psychiatric Review Technique Form that was largely unremarkable. R. at 387-98. Finally, he provided a short narrative indicating Plaintiff's medical records did not support her claimed limitations. R. at 399.

Dr. Van Kinsey completed a Physical Residual Functional Capacity Assessment on May 1, 2003. He indicated Plaintiff could lift ten pounds occasionally and less than ten pounds frequently, stand or walk two hours a day, and sit six hours day. He noted Plaintiff's medical records did not suggest any trauma or cause for the extreme pain she reported in her back, knees, hips and hands (although he described her as "morbidly obese"). Dr. Kinsey also wrote her "range of symptoms are somewhat inconsistent" and "wt loss would certainly improve functional capacity." R. at 405-12.

Dr. Sharol McGehee examined Plaintiff on July 19, 2004. She told Dr. McGehee she experienced "hallucinations and delusions. She hears voices, sees lights flicking, and people who are not actually there." Dr. McGehee concluded Plaintiff was "an extremely high risk for suicidal ideation and gesturing" and suffered from severe major

7

depressive disorder with psychotic features.  He assessed her GAF score at 25.  R. at 485-87.

### E.  The ALJ's Opinion

The ALJ found Dr. Ball's statements to be inconsistent in that they reflected diminishing capacity without a corresponding change in Plaintiff's medical condition. The ALJ also believed the March 4, 2005, MSS-P was internally inconsistent because it suggested no real limitations other than Plaintiff's inability to sit, stand or walk for long periods.  "In giving little weight to Dr. Ball's opinion of limited sitting and standing, the undersigned is persuaded that the claimant['s] alleged extreme limits in sitting are inconsistent with his failure to find other similar limitations."  The ALJ noted Dr. Dugan was not a mental health specialist, while Dr. Lutz was; therefore, Dr. Lutz' opinion had greater value – particularly when combined with the fact that Dr. Lutz performed objective testing while Dr. Dugan did not.  Dr. Simpson's opinion that Plaintiff was markedly limited in her ability to carry out detailed instructions and maintain concentration was deemed not inconsistent with the ability to perform unskilled work.  R. at 17.

## II.  DISCUSSION

### A.  Standards

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final

decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Generally speaking, a treating physician's opinion is entitled to deference.  This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record.  E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  In addition, a specialist's opinion is entitled to greater weight.  E.g., Hensley v. Barnhart, 352 F.3d 353, 356 (8th Cir. 2003).

## B.  Appropriate Deference to Plaintiff's Physicians

As stated earlier, Plaintiff's sole issue relates to the amount of deference given to her physicians' opinions.  With respect to Dr. Ball, Plaintiff argues his MSS-P's are not inconsistent when read in chronological order because they reflect Plaintiff's deteriorating condition.  The problem with this argument is that Dr. Ball's notes do not reflect Plaintiff's condition was deteriorating, so there is no clinical or other data to support Dr. Ball's 2005 assessment of Plaintiff's functional capacity.  In fact, Dr. Ball had not seen Plaintiff or over a year when he prepared his last MSS-P.  The Record provides substantial evidence justifying the ALJ's decision not to credit Dr. Ball's opinion.

Plaintiff also contends greater credence should have been accorded to Dr. Dugan's opinions expressed in his MSS-M.  She also contends it was improper for the ALJ to take into account the fact the Dr. Dugan (unlike Dr. Lutz, who reached different conclusions) was not a specialist.  Plaintiff's second argument is simply wrong.  It should also be noted that, unlike Dr. Dugan, Dr. Lutz performed tests and provided the results.  As to Plaintiff's first contention, the Record reflects Dr. Dugan never examined his patient with respect to the conditions he reflected in the MSS-M; Plaintiff saw Ms.

9

Franklin. Plaintiff came to Dr. Dugan's office three times in the nine months before this opinion was rendered, and then only to obtain prescription refills. The most serious reports to Ms. Franklin involved situational depression (e.g., the stress of having many visitors in the home, the impending death of a relative). The ALJ was not obligated to defer to Dr. Dugan's opinion that Plaintiff was markedly limited in any of her abilities because nothing in the Dr. Dugan's records supports his opinion.

Plaintiff next argues the ALJ should have deferred to Dr. Simpson's opinions as reflected in his 2003 MSS-M. To the contrary, the ALJ was justified in concluding Dr. Simpson's contemporaneous treatment notes contradicted the 2003 MSS-M. The vast majority of Dr. Simpson's notes reflect Plaintiff's depression was favorably treated with medication and there were long stretches of time – particular near the date Dr. Simpson issued his last MSS-M – that Plaintiff did not feel the need to return to see Dr. Simpson.

Finally, Plaintiff contends the ALJ should have relied more heavily on Dr. McGehee's consulting opinion. The ALJ focused on the timing of this visit, observing it occurred when Plaintiff undergoing a divorce so her condition would be likely be worse than usual but not permanently affected. Moreover, Plaintiff told Dr. McGehee she was experiencing hallucinations, hearing voices, seeing things that were not there and had thoughts of suicide, yet she never made such representations to any other physician, including her treating physicians. The ALJ was justified in discounting Dr. McGehee's conclusion because it was based on facts that were not supported in the record as a whole.

### III. CONCLUSION

For these reasons, the ALJ was justified in discounting the opinions referenced above. Plaintiff presents no other challenge to the ALJ's formulation of her residual functional capacity, so that formulation must be accepted as valid. Plaintiff also does

not challenge any other aspect of the ALJ's findings. For these reasons the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

                                              /s/ Ortrie D. Smith
                                              ORTRIE D. SMITH, JUDGE
DATE: September 17, 2007                UNITED STATES DISTRICT COURT